# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### JUNE, 1998 SESSION



FILED

November 4, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | No. 01C01-9711-CC-00540 |
| | ) | |
| Appellee | ) | |
| | ) | Robertson County |
| vs. | ) | |
| | ) | Honorable John H. Gasaway, III, Judge |
| **TERRENCE LEE HANNAH,** | ) | |
| | ) | (Second Degree Murder) |
| Appellant. | ) | |

FOR THE APPELLANT:

MICHAEL R. JONES
14th District Public Defender
110 Sixth Ave. West
Springfield, TN 37172

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

ELIZABETH B. MARNEY
Assistant Attorney General
Criminal Justice Division
425 Fifth Ave. North
2d Floor, Cordell Hull Bldg.
Nashville, TN 37243-0493

JOHN WESLEY CARNEY, JR.
District Attorney General
204 Franklin St. Suite 200
Clarksville, TN 37040-3420

DENT MORRISS
Assistant District Attorney General
500 So. Main St.
Springfield, TN 37172

OPINION FILED: _____

**AFFIRMED**

CURWOOD WITT
JUDGE

**OPINION**

The defendant, Terrence Lee Hannah, was convicted in a jury trial in the Robertson County Circuit Court of second degree murder, a Class A felony. The jury acquitted him of first degree premeditated murder. As a Range I, standard offender, he received a twenty-year sentence. The defendant must serve no less than 85% of his sentence.[1] In this direct appeal, the defendant challenges the sufficiency of the evidence, the admissibility of his confession, and the trial court's sentencing determination. Having reviewed the record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

**I. Facts**

On the evening of February 5, 1996, Robertson County Deputy Steve Colbert answered a call at a large trailer park in Cook's Hollow where he found Roger Ryan, the victim, lying on the floor in his small trailer. Another man, J. P. Nolan, was administering CPR. The victim, who had been shot in the abdomen from close range with a shotgun, was pronounced dead upon arrival at the hospital. Cindy Nolan named the defendant as the shooter and pointed the officer to where he was leaning against a tree. The defendant was quite intoxicated and had a strong odor of alcohol about him. The deputy had to steady him as they walked to the patrol car. The deputy noticed that the defendant had a cut over one eye. After other officers arrived, Deputy Colbert transported the defendant to the emergency room where a sample of the defendant's blood was drawn. Testing of the sample revealed that his blood alcohol level was .28 grams percent at 11:15 p.m. Emergency room personnel treated and closed the cut with a butterfly bandage.

---

[1] The statute provides that for a person convicted of certain designated offenses, including second degree murder, committed after July 1, 1995, "[s]uch person shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained. However, no sentence reduction credits authorized by § 41-21-236, or any other provision of law, shall operate to reduce the sentence imposed by the court by more than fifteen percent (15%)." Tenn. Code Ann. § 40-35-501 (I)(1), (2) (1997).

After arriving at the sheriff's department at approximately 12:10 a.m., the defendant gave a statement to the police in which he confessed that he shot Roger Ryan.

At trial, Cindy Nolan, her husband, J. P. Nolan, and John Buckliew, a neighbor, described the events that led up to Roger Ryan's death. Ryan, Nolan, Buckliew, and the owner of the trailer park spent the day thawing and repairing a broken water line at Buckliew's trailer. The defendant stopped by briefly but then left to cut firewood with some friends. Ryan, Nolan and Buckliew gathered at Nolan's place after completing the repairs. Cindy Nolan and Buckliew's wife were also present. The men drank beer.[2] When the defendant arrived sometime around seven o'clock, he was already intoxicated. Ryan, who had known the defendant since childhood, tried to talk to him about his excessive drinking and use of drugs. The conversation became heated, and the defendant accused Ryan of calling his mother a whore. No one else at the trailer heard Ryan make such a statement. J.P. Nolan was able to calm the defendant temporarily. However, the defendant kept returning to the subject, and the situation between the two men again became tense although no blows were exchanged. Finally Ryan decided to leave and Buckliew accompanied him. Within a few minutes, the defendant turned down Nolan's offer to sleep on the couch and departed declaring that he was going home to bed.[3]

Nolan and his wife were accustomed to checking on the defendant, and they decided to look in on him shortly after he left. As they walked out their door, they heard a loud bang and then saw the defendant walking toward their house hollering "J.P., J.P." Nolan approached the defendant who told him, "I think

---

[2]  Detective Jessie Richardson testified that, in his opinion, Nolan and Buckliew were highly intoxicated when he arrived. According to the medical examiner's report, Ryan's blood alcohol level was .21 when he died.

[3]  Cindy Nolan testified during direct examination that the defendant left her home about 30 minutes after the victim had departed. When confronted with her testimony at the preliminary hearing in which she had said that the defendant had departed after five minutes, she conceded that the five minutes was probably the more accurate estimate.

I just shot Roger." He took the shotgun out of the defendant's hands. While his wife and the defendant went into the Nolans' house to call 911, Nolan put the shotgun in a vacant trailer and went to find the victim. The Nolans both noticed that the defendant now had a cut over one eye. When Nolan arrived at the victim's trailer, Ryan was alive and still able to speak. He soon became comatose, however, and Nolan's attempt at CPR did little to revive him. The medical examiner reported that the victim died from a gun shot wound to the abdomen. The pellets perforated the lower portion of the aorta, the vena cava, and other arteries and veins causing him to bleed to death.

John Buckliew was present when the defendant shot Ryan. He testified that he and the victim were seated on the victim's sofa when the defendant knocked on the door. Ryan opened it, and the defendant asked him why he had called his mother a whore. Ryan again denied insulting the defendant's mother and told the defendant to go home and get some rest. He closed the door. Within a few moments, there was another knock. The victim cracked open the door. Buckliew again heard the defendant accuse the victim of calling his mother a whore. An object appeared in the slot created by the open door, a shot was fired, and Ryan fell to the floor.

The officers recovered a black-handled steak knife from the area near the steps to the victim's trailer. In the same area, they found some blood-spattered paving stones. According to the serologist who testified at trial, the knife tested negative for blood. The blood on the stones, however, was consistent with that of the defendant.

The prosecutor played the defendant's taped statement for the jury, and Detective Donald Bennett read aloud the brief statement he took from the defendant prior to turning on the tape recorder. In his statements, the defendant said that Ryan and another man got him down in the road and that Ryan kicked him

4

in the face with his cowboy boots and hit him in the leg with a stick. Although at first he said he didn't own a shotgun, he then admitted he went home and returned with the gun. He knocked on the door, walked in and shot Ryan. He said that Cindy was in Ryan's trailer at the time and that Ryan had threatened to get his .38 and shoot him. However, a police search of the victim's trailer turned up no weapons, and other proof showed that when the victim died, he was wearing heavy work boots.

The defense called several witnesses including Dr. Charles Harlan, a consulting pathologist, Dr. Gillian Blair, a clinical psychologist, and the defendant. Dr. Harlan testified at length about the effects of alcohol and the different degrees of intoxication. According to his testimony, a person whose blood alcohol level is .21 grams percent has reached the point of "medical intoxication" and is subject to nausea, vomiting, and passing out. At .30, death may result. Humans metabolize alcohol at a rate of about .015 grams percent per hour. Therefore if one's level were .28 at 11:15 p.m., the level would have been .31 two hours earlier. At such a level, one's judgment and reaction time would be seriously impaired. During cross-examination, Dr. Harlan testified that people develop a tolerance to alcohol, and that someone might have a blood alcohol level of .45 and still appear to be functioning. In rebuttal, the state challenged Dr. Harlan's conclusions by recalling Dr. Jones. Dr. Jones testified that the data was insufficient to extrapolate the defendant's blood alcohol level at the time of the killing from the level two hours later. Dr. Jones also questioned the accuracy of Dr. Harlan's stages of intoxication. He said that he had never heard of "medical" intoxication.

Dr. Gillian Blair, a clinical psychologist, conducted two separate evaluations of the defendant. She reported that he was extremely cooperative throughout the six hours that she spent with him. She described him as a generally modest and retiring person. His full scale IQ score of 75 indicates borderline intellectual functioning. She opined that his long history of alcohol and drug abuse

5

had probably caused some deteroriation since his high school days. According to her testing, the defendant suffers from a significant anxiety disorder and depression. The suicide of his mother and his brother's death from AIDS were traumatic events in his life. His ex-wife and two children live in his father's home. Some tension existed between the defendant and his father, who is a recovering alcoholic. His father had recently told the defendant that he was not welcome if he continued to drink. Dr. Blair stated that at the time of the killing, the defendant would not have been capable of formulating the intent to intentionally or knowingly kill Roger Ryan due to his low intellectual functioning and the level of alcohol in his system. On cross-examination, she acknowledged that she was not familiar with the statutory definitions of "intentional" or "knowing;" however, she believed that the defendant's response to the situation had been a "knee-jerk" reaction rather than a decisive act.

The defendant testified on his own behalf. He recalled cutting firewood with his friends and remembered drinking nearly a case of beer during the day. He knew he had gone to J.P's house and that during an argument, the victim had insulted his mother. He remembered that he was lying on the ground when the victim stomped him in the face with a cowboy boot. The next thing he remembered was waking up in jail. He could not recall shooting Roger Ryan or giving a statement to the police.

On these facts, the jury acquitted the defendant of first degree premeditated murder but convicted him of murder in the second degree. The defendant now contends that the proof at trial was insufficient to establish beyond a reasonable doubt that he knowingly killed Roger Ryan.

II. **Sufficiency of the Evidence**

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is, whether after considering the evidence in the

6

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S. Ct. 2781, 2789 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990). Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, a convicted defendant has the burden of demonstrating on appeal that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining that sufficiency, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). It is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S. Ct. 2781, 2789; State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e).

Keeping in mind the appropriate standard of review, we conclude that the evidence is sufficient to sustain the defendant's conviction for second degree murder. The defendant argues that the proof is adequate only to convict him of voluntary manslaughter. Although the record contains evidence from which a jury could have concluded that the defendant shot the victim "in a state of passion produced by adequate provocation," Tenn. Code Ann. § 39-13-211 (1997), the jury did not so conclude. Although the blood spatters on the gravel outside the victim's front door and the cut over the defendant's eye tend to corroborate the defendant's claim that the victim and John Buckliew knocked the defendant down and kicked him when he was on his way back to his trailer, Buckliew testified that the defendant

7

came to the victim's door two times, and the second time, he shot Ryan who was unarmed and nonthreatening. Even if the attack occurred as the defendant contends, the jury could conclude that sufficient time had passed for the defendant's passion to cool. The testimony of everyone who was present that night confirms that the defendant was convinced that the victim had maligned his mother. However, the jury may well have found that even though the defendant sincerely believed that the victim had insulted his mother, the insult was not sufficient provocation to justify a killing.

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210 (1997). In the light most favorable to the state, the proof shows that the defendant became angry with the victim over an alleged insult. The victim and another man left the gathering at the Nolan residence and went to the victim's trailer. Within a few moments, the defendant knocked on the door and asked the victim why he had insulted his mother. The victim told him he considered the defendant's mother to be his own and that the defendant should go home and get some sleep. In his statement to the police, the defendant admitted that he went to his trailer to retrieve his shotgun. When the victim cracked open the door in response to the defendant's second knock, the defendant fired the weapon. The evidence is sufficient for a rational jury to conclude beyond a reasonable doubt that the defendant knowingly killed Roger Ryan.[4]

---

[4] The defendant does not argue that due to his high degree of intoxication, he was unable to formulate the intent to kill another "knowingly." We note that although the defendant's blood alcohol level two hours after the shooting was .28 grams per cent, both state and defense expert witnesses agreed that experienced drinkers are able to function even when their blood alcohol level is extremely high. The jury had these facts before them on which to base their conclusions, and they concluded that the defendant was capable of committing a knowing killing. Whether a defendant is too intoxicated to form the requisite mental state is a question for the jury to determine as the sole trier of fact. State v. Howard, 926 S.W.2d 579, 584 (Tenn. Crim. App. 1996); State v. Brooks, 909 S.W.2d 854, 859 (Tenn. Crim. App. 1995). This court does not evaluate or reweigh the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). We must affirm a conviction if there is evidence in the record from which a rational juror could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S. Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e).

### III. Suppression of Defendant's Statements

The defendant argues that the trial court should have suppressed his two statements to the police because they were given involuntarily while he was in a high state of intoxication and without an intelligent waiver of his rights. The state contends that intoxication does not invalidate a confession if the accused is capable of understanding and waiving his rights. We find that the evidence in the record does not preponderate against the trial court's finding that despite the defendant's high blood alcohol content, the defendant was coherent and responsive during questioning and that he gave a voluntary, knowing and intelligent statement to the police.

A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently" to be valid. Miranda v. Arizona, 384 U.S. 436, 475, 86 S. Ct. 1602, 1628 (1966). The state has the burden of showing voluntariness by a preponderance of the evidence. State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980). The totality of the circumstances surrounding the interrogation must reveal both an uncoerced choice and the required level of comprehension. State v. Stephenson, 878 S.W.2d 530. 544-545 (Tenn. 1994).

Before an accused is entitled to have his statement suppressed because he was under the influence of alcohol or other drugs, the accused must establish that the statement cannot be considered the product of a free mind and rational intellect. State v. Leonard Lebron Ross, No. 03C01-9404-CR-00153, slip op. at 7 (Tenn. Crim. App., Knoxville, Apr. 10, 1996); State v. Teeters, No. 02C01-9304-CC-00051, slip op. at 4-5 (Tenn. Crim. App., Jackson, Feb. 2, 1994); State v. Michael Abernathy, No. 03C01-9111-CR-00372, slip op. at 13 (Tenn. Crim. App., Knoxville, Oct. 2, 1992), perm. app. denied (Tenn. 1992) ; see State v. Robinson, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980); Bram v. United States, 168 U.S. 532, 18 S. Ct. 183, (1897). Generally, if the accused is capable of giving a narrative of

9

past events and relating his role in the commission of the crime, the statement is admissible even though the accused was under the influence of alcohol when he made the statement. Leonard Lebron Ross, slip op. at 7; Larry Thomas Teeters, slip op. at 5; Michael Abernathy, slip op. at 13.

A trial court's findings of fact at the conclusion of a hearing on the merits of a motion to suppress have the weight of a jury verdict. State v. Aucoin, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988). Those findings are presumptively correct on appeal and are binding on this court unless the evidence in the record preponderates against them. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994); State v. Woods, 806 S.W.2d 205, 208 (Tenn. 1990).

In this case, the trial court found that when the police arrived at the scene at approximately 9:00 p.m, the defendant was highly intoxicated. He could not stand or walk unaided and was very emotional. Although the deputies asked him no questions, he made a number of incriminating statements. The trial court suppressed these statements finding that the defendant was incapable of giving a voluntary, knowing and intelligent waiver of his rights at that time.[5] The defendant's blood sample taken at approximately 11:15 p.m. indicated a blood alcohol level of .28 grams percent. An hour later, the police advised the defendant of his miranda rights and conducted a formal interview. At first the detectives spoke with the defendant and obtained a brief narrative of the events. Detective Donald Bennett reduced this conversation to writing. Then, after advising the defendant of his rights line by line, the detectives again took the defendant through the events of the evening and recorded the interview on tape. The detectives testified that at this time the defendant was able to walk normally and that although he cried during the interview, his demeanor was much less emotional than it had been earlier. The trial court specifically accredited this testimony. The defendant testified that he did not

---

[5] The defendant does not contend that his later confession was tainted by his earlier involuntary statements. We, therefore, have not addressed this issue.

10

recall being interrogated or making any statements. The trial judge, after listening to the tape recorded session and reading Detective Bennett's account of the earlier portion of the interview, found that the defendant was coherent and responsive during the interview. He noted that the two statements were very similar and that the defendant was capable of creating a logical narrative of past events. In particular, the trial court found that the defendant had sufficient presence of mind and coherence of thought to attempt to exculpate himself. The trial court concluded that the defendant, although intoxicated, was sufficiently aware of what he was doing to make a voluntary waiver and statement.

The evidence in the record does not preponderate against the findings of the trial court. The appellant was properly advised of his rights and was not coerced. At the hearing, he identified his signature on the waiver as being his "regular" signature and testified that he was able to read. The statements reveal that although he at first denied owning a shotgun, he quickly admitted that he shot the victim. He told the officers that the victim had insulted his mother and that they fought in the road. After the victim "stomped him hard" and threatened to get his .38 and shoot him, he went home and got his gun. He returned, and when the victim opened the door, he fired the fatal shot. He insisted that Cindy Nolan was present in the trailer when he killed the victim who, he said, was acting "crazy."

Clearly, many of the defendant's statements to the police were self-serving and intended to justify the shooting. At first, he denied owning the shotgun until he was confronted with the news that his father and brother had identified the weapon as his. Then he tried to convince the police that he shot the victim in self defense. He recalled a previous time when he and the victim fought. See State v. Michael Abernathy, No. 03C01-9111-CR-00372, slip op. at 14 (Tenn. Crim. App., Knoxville, Oct. 2, 1992), perm. app. denied, (Tenn. 1992).

11

Although the defendant sobbed at times during the interview, he was able to create a narrative of past events and to relate his role in the offense. The officers testified that despite the smell of alcohol on the defendant's breath, he was no longer so incapacitated that he could not understand his rights and waive them voluntarily. The trial court found the officers' testimony to be credible. We do not believe that the evidence preponderates against the trial court's determination that he made a knowing, voluntary, and intelligent waiver of his rights.

We must also conclude that the defendant's statement was voluntary. The 40-year-old defendant had completed the ninth grade. The interrogation was not lengthy. The minor cut to the defendant's head had been treated at the hospital, and nothing indicates that the police deprived the defendant of food, sleep, or medical attention. The police did not coerce or threaten him. Under the totality of the circumstances, we cannot conclude that the trial court erred in denying the defendant's motion to suppress. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996).

## IV. Mitigating Factors

In his final issue, the defendant argues that the trial court erred in finding that no mitigating factors existed and in sentencing him to twenty years for second degree murder. Finding no error, we affirm the trial court's judgment.

When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code

Ann. § 40-35-401(d)(1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, the arguments of counsel, the appellant's statements, the nature and character of the offense, and the appellant's potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -210(b) (1997); State v. Ashby, 823 S.W.2d at 169. The defendant has the burden of demonstrating that the sentence is improper. Id. In the event the record fails to demonstrate the appropriate consideration by the trial court, appellate review of the sentence is purely de novo. Id. If our review reflects that the trial court properly considered all relevant factors and the record adequately supports its findings of fact, this court must affirm the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the sentencing range, the specific sentence, and the propriety of imposing a sentence involving an alternative to total confinement. In this instance, the trial court considered the evidence presented at trial and the sentencing hearing, the presentence report, the victim impact statement, the sentencing principles, and other sentencing considerations. See Tenn. Code Ann. §§ 40-35-103(5) and 40-35-210(a), (b) (1997); State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993). Therefore, we review the defendant's sentence with a presumption that the trial court's determination is correct.

At the conclusion of the sentencing hearing, the trial court found that the defendant was subject to a Range I sentence of 15 to 25 years. Tenn. Code Ann. § 40-35-112(a)(1)(1997). As a Class A felon, Tennessee Code Annotated section 40-35-501(I)(1) requires him to serve 100% of his sentence. Jail credits for

13

good behavior may not reduce his sentence by more than 15%. Tenn. Code Ann. § 40-35-501(I)(1), (2) (1997). The presumptive sentence for a Class A felony is the midpoint of the range. Tenn. Code Ann. § 40-35-210(c) (1997). The sentence may then be increased by any applicable enhancement factors and reduced in the light of any applicable mitigating factors. Tenn. Code Ann. § 40-35-210(d),(e) (1997). The trial court, however, found no enhancement factors and no mitigating factors and, therefore, sentenced the defendant to serve twenty years in the Department of Correction.

The defendant contends that the evidence supports the application of several mitigating factors. He argues that he acted under strong provocation, that substantial grounds exist that tend to excuse or justify his criminal conduct, that he was suffering from a mental or physical condition other than the voluntary use of intoxicants that significantly reduced his culpability, and that the offense was committed under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his criminal conduct. Tenn. Code Ann. § 40-35-113(2),(3),(8), and (11) (1997). The trial court found that there was no evidence of strong provocation, that voluntary intoxication does not fall within the purview of the statute, and that chronic intoxication had caused the defendant's mental deficiencies.

The defendant has failed to show that the trial court's sentence is improper. The trial court found that no strong provocation or justification for his conduct existed and that the chronic use of alcohol and its related effect are not within the purview of the statute. The evidence in the record does not preponderate against the findings of the trial court. Therefore, we affirm the defendant's sentence of twenty years.

**Conclusion**

14

We affirm the defendant's conviction for second degree murder and his twenty-year sentence as imposed by the trial court.

_____
CURWOOD WITT, Judge

CONCUR:

_____,
JOE G. RILEY, Judge

_____,
LEE MOORE, Special Judge

15